IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Gregory Wayne Keefer,                )      C/A No.: 1:15-4738-SVH
                                     )
              Plaintiff,             )
                                     )
       vs.                           )
                                     )            ORDER
Carolyn W. Colvin, Acting            )
Commissioner of Social Security      )
Administration,                      )
                                     )
              Defendant.             )
_____)

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain dated August 31, 2016, referring this matter for disposition. [ECF No. 17]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 16].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On February 22, 2010, Plaintiff filed an application for DIB in which he alleged his disability began on August 10, 2009. Tr. at 117–18. His application was denied initially and upon reconsideration. Tr. at 57–60, 65–66. On March 10, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Thomas G. Henderson. Tr. at 25–52 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 21, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–24. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Plaintiff brought an action seeking judicial review of the Commissioner's decision in a complaint filed on October 5, 2011. Tr. at 435–38. On March 13, 2013, the court issued an order reversing the Commissioner's decision and remanding the matter for further administrative proceedings pursuant to 42 U.S.C. § 405(g). Tr. at 439–65.

On September 26, 2013, Plaintiff had a second hearing before ALJ Henderson. Tr. at 406–14 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 7, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 396–405. Plaintiff brought an action seeking judicial review of the Commissioner's decision in a complaint filed on January 27, 2014. *Keefer v. Commissioner of Social Security Administration*, No. 1:14-236-SVH, ECF No. 1. On January 5, 2015, the court issued an order reversing the Commissioner's decision and remanding the case to an ALJ. Tr. at 610–43. On February 7, 2015, the Appeals Council issued an order vacating the final

decision of the Commissioner, remanding the case to an ALJ for further proceedings, and directing that the case be assigned to a different ALJ. Tr. at 644–47.

On August 24, 2015, Plaintiff had a third hearing before ALJ Ronald Sweeda. Tr. at 582–99 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 23, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 570–81. The ALJ's decision provided Plaintiff with the option to either file exceptions with the Appeals Council within 30 days or to file an action in this court within 60 days of the date on which the ALJ's decision became final.[1] Tr. at 570–72. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 24, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 53 years old on his date last insured ("DLI"). Tr. at 117. He completed the eighth grade. Tr. at 135. His past relevant work ("PRW") was as a boiler operator and truck driver. Tr. at 191. He alleges he has been unable to work since August 10, 2009. Tr. at 117.

2.    Medical History[2]

a.    Records Prior to Plaintiff's DLI

On January 16, 2008, Plaintiff complained of fatigue to a physician at Doctors Care, where an assessment included fatigue and joint pain. Tr. at 301. Lab results dated

---

[1] The ALJ's decision explained that it would become the final decision of the Commissioner on the sixty-first day after the date it was issued.

[2] Because Plaintiff presented no new medical evidence upon remand, his medical history is recited from the court's January 5, 2015 decision.

January 21, 2008, indicated hypothyroidism, and Plaintiff was started on Levothyroxine. Tr. at 292. Notes from follow up visits on January 21, 2008, and February 18, 2008, showed diagnoses of hypothyroidism, hyperlipidemia, and depression/anxiety. Tr. at 288, 291. In May 2008, Plaintiff's prescriptions included Levothyroxine for hypothyroidism, Celexa for depression, and Pravastatin for elevated cholesterol. Tr. at 286.

On May 3, 2009, Plaintiff presented to the emergency room ("ER") at Roper Hospital with complaints of lower abdominal pain and difficulty urinating. Tr. at 194. He reported a history of kidney stones, prostatic stones, anxiety, and hemorrhoids. *Id.* Discharge diagnoses included chest pain of unknown cause and epididymitis (inflammation of the organ just behind the testicle; often caused by heavy lifting/exercise). Tr. at 206. The attending physician recommended Plaintiff follow up with cardiac stress testing and an ultrasound. Tr. at 206–07.

Plaintiff followed up with Francis Tunney, M.D. ("Dr. Tunney"), at Patient One on May 5, 2009. Tr. at 218. He complained of snoring and daytime fatigue and reported a history of depression. *Id.* On examination, Plaintiff exhibited a normal gait and stance, musculoskeletal posture, balance, mood, and memory. Tr. at 220. Dr. Tunney noted that Plaintiff's scrotal pain was of unclear etiology and advised him to follow up with his primary care physician. *Id.*

b.    Records After Plaintiff's DLI

Plaintiff initiated care with David Castellone, M.D. ("Dr. Castellone") of Palmetto Primary Care on November 13, 2009. Tr. at 368. He reported pain in his hips, legs, and back and swelling in his right leg. *Id.* He stated he had been diagnosed with hypertension,

anxiety, and depression years before and indicated he had been experiencing back ache and back pain for months. *Id.* Dr. Castellone diagnosed new anxiety, hypertension, degenerative disc disease, and paresthesias/weakness in the legs. *Id.* He also ordered magnetic resonance imaging ("MRI") and nerve conduction studies and prescribed Celexa and Lortab. Tr. at 369. An MRI of Plaintiff's lumbar spine dated November 19, 2009, revealed mild degenerative facet arthropathy at L5–S1, but no compromise of the exiting L5 nerve root. Tr. at 222.

Dr. Ruth Hoover conducted a nerve conduction study ("NCS") on November 24, 2009. Tr. at 365. She noted that the results were difficult to interpret due to a lot of cramping during the test. *Id.* She noted signs of acute (rather than chronic) nerve root irritation at S1 bilaterally. *Id.* Dr. Hoover opined that Plaintiff's description of his pain was a bit confusing in that it seemed variable. *Id.* She stated that the MRI was not impressive, but that she was "impressed by the clinical picture and the appearance of S1 irritation despite the MRI." *Id.* She ultimately noted that the NCS were within normal limits, but that some of Plaintiff's muscles showed moderately increased spontaneous activity. *Id.*

Plaintiff returned to Dr. Castellone on December 1, 2009, with constipation, back pain, depression, and anxiety. Tr. at 359. He described his back pain, depression, and anxiety as severe and indicated the back pain began months before. *Id.* Dr. Castellone diagnosed Plaintiff with worsening degenerative disc disease and worsening radiculopathy, as well as stable anxiety and hypertension. Tr. at 361. He referred Plaintiff to a pain clinic and gastroenterologist. *Id.*

Plaintiff presented to Summar C. Phillips, M.D. ("Dr. Phillips"), of Pain Care Physicians of Charleston on December 3, 2009, with lower back pain. Tr. at 225. He reported pain in his lower back that had begun years earlier. *Id.* He stated the pain radiated into his hips, buttocks, legs, and feet bilaterally and was sustained at five to six on a 10-point scale most days. *Id.* He described it as being worse in the evening and sometimes associated with weakness, tingling, and numbness. *Id.* He stated that Lortab worked best to alleviate his pain, but that it only "takes the edge off." *Id.* Plaintiff reported his daily activities included working as a truck driver and general house maintenance, but said that he was unable to perform those tasks without pain. *Id.* Dr. Phillips administered an epidural steroid injection at L5–S1. Tr. at 226. Following the injection, Plaintiff reported that his pain was reduced to a four. *Id.*

Plaintiff underwent nuclear stress testing on December 8, 2009. Tr. at 305. He was assessed as having fair exercise tolerance. *Id.* The physician who administered the test noted a mild defect, but the results were otherwise normal. *Id.*

Plaintiff returned to Dr. Phillips on December 23, 2009. Tr. at 229. He reported that his response to the prior injection was "real good" for two weeks, but that he still had weakness and that his pain gradually returned to a five. *Id.* Dr. Phillips administered another epidural steroid injection at L5–S1, which he indicated reduced his pain to a two. Tr. at 230, 231.

Plaintiff underwent an MRI on December 31, 2009. Tr. at 307. It revealed mostly mild diffuse spondylosis and the presence of a disc osteophyte complex at C6–7 that extended intraforaminally on both sides and could contact the exiting C7 (nerve roots).

*Id.* The MRI also demonstrated a focal central superior and inferior extrusion that caused moderate central stenosis and mild anterior cord flattening. *Id.*

On January 6, 2010, Plaintiff reported to Dr. Phillips that the last lumbar epidural injection had not provided any relief and that he had required daily use of Lortab and Flexeril. Tr. at 233. Dr. Phillips noted that Plaintiff's leg pain had improved significantly, but that he continued to experience persistent pain in his lower back and buttocks. *Id.* Plaintiff reported that medications helped as long as he sat still. *Id.* He stated he had been limiting his daily activity to just resting and taking it easy due to the pain. *Id.* On examination, Plaintiff exhibited tenderness in the area of the SI joint on the right, tenderness over the sacrum midline, and pain upon flexion and extension of the lumbar spine. *Id.* However, he maintained full range of motion ("ROM") of the lumbar spine. *Id.* Dr. Phillips diagnosed low back pain, radicular symptoms of the lower limbs, neck pain, cervical radiculopathy, sacroiliitis, and facet arthropathy syndrome. *Id.* She opined that Plaintiff's pain could be caused by either the facet arthropathy shown on the MRI or by SI joint arthropathy. Tr. at 234. Dr. Phillips noted that Plaintiff's leg pain, which had previously prevented him from walking, improved greatly with the two lumbar injections. *Id.* However, Plaintiff continued to report leg pain in a bilateral S1 pattern while lying flat. *Id.* She further noted that given Plaintiff's good response to lumbar epidural injections, Plaintiff most likely had simple lumbar radiculopathy. *Id.* Dr. Phillips recommended that Plaintiff start Celebrex and undergo another injection in one week. *Id.*

Plaintiff returned to Dr. Phillips on January 13, 2010, complaining of severe pain in his neck for several days. Tr. at 235. Dr. Phillips started to administer a cervical

epidural injection, but did not complete it because Plaintiff reported lightheadedness and dizziness. *Id.* Plaintiff returned the following day, and Dr. Phillips performed a successful cervical epidural injection at C5–6. Tr. at 241.

On January 28, 2010, Plaintiff reported that the cervical epidural injection had helped with the pain and stiffness in his neck and with some with the radiating pain down his arms. Tr. at 243. He complained of weakness in his legs and pain between his shoulder blades and in his low back. *Id.* On examination, Dr. Phillips found thoracic and lumbar paraspinal tenderness and assessed Plaintiff's progress as "moderate at best." Tr. at 243–44. She noted that Plaintiff would be a great candidate for a spinal cord stimulator. Tr. at 244. She suspected that Plaintiff's upper back pain was muscular in nature and prescribed a transcutaneous electrical nerve stimulation ("TENS") unit, ice therapy, and lidoderm patches. Tr. at 244.

Plaintiff received another lumbar epidural injection on February 16, 2010. Tr. at 245. On March 9, 2010, Plaintiff reported relief from that injection, but stated that all the injections wore off after a while. Tr. at 249. He complained of shooting pain and muscle spasms in his hip, legs, and back. *Id.* He stated that bending or twisting aggravated his pain, but that taking hot baths and using medication improved it. *Id.* Although still in pain, he agreed that his quality of life had improved with the injections and that he was able to perform his normal activities in less pain. *Id.*

On April 8, 2010, Plaintiff sought an opinion regarding leg weakness, discomfort, and refractory pain from John Plyler, M.D., a neurologist with Charleston Neurology Associates. Tr. at 317. He reported leg weakness and discomfort in his hips and legs,

8

episodic arm jerking, dizziness, and numbness of his feet. *Id.* He stated that he had multiple epidural injections with only a marginal response over time. *Id.* On examination, Plaintiff had decreased but symmetric reflexes, patchy sensory spots distally, and some spasm in his neck and lumbar muscles. *Id.* Dr. Plyler noted he was "significantly overweight." *Id.* He assessed diagnoses of chronic neck/back pain, paresthesias and dysthesia, possible myofascial fibromyalgia pain syndrome, tinnitus, anxiety, and depression. Tr. at 317–18. He recommended an electrophysiology evaluation, brain imaging, and baseline labs. Tr. at 318. The nerve study was normal. Tr. at 319–21. An MRI of the thoracic spine showed left central disk protrusion at T9–T10 that effaced the left ventral aspect of the thoracic cord; however, the thoracic cord demonstrated normal signal. Tr. at 316. An MRI of Plaintiff's brain was unremarkable. Tr. at 313, 315.

In a follow-up visit with Dr. Plyler on April 27, 2010, Plaintiff reported weakness in his legs and discomfort in his legs and throughout his spine. Tr. at 313. He indicated his legs gave out with any physical activity. *Id.* He reported tremors, shakes, and syncopal and blackout events, which he stated had been occurring for about five years. *Id.* Dr. Plyler recommended an additional thyroid panel, a vitamin D supplement, a possible rheumatological evaluation, a sleep evaluation, a neurosurgical evaluation for the thoracic disc, and a cardiology opinion with regard to syncope. Tr. at 313–14.

State-agency consultant Olin Hamrick, Jr., Ph. D., completed psychiatric review technique form ("PRTF") on June 2, 2010. Tr. at 251–64. He found there was insufficient evidence upon which to make a medical disposition or assess Plaintiff's functional limitations. *Id.*

On July 29, 2010, Plaintiff reported to Dr. Castellone's office that he had almost passed out, that the left side of his face was swollen, and that he was experiencing memory loss. Tr. at 357. On examination, Plaintiff exhibited decreased ROM and pain in his extremities. Tr. at 358. He was referred for a carotid Doppler flow study. *Id.*

On August 3, 2010, Plaintiff consulted with Jason Highsmith, M.D. ("Dr. Highsmith"), a neurosurgeon. Tr. at 331. On examination, Dr. Highsmith noted that Plaintiff was in significant pain with motion and was "clearly uncomfortable." *Id.* Plaintiff exhibited paraspinous tenderness throughout the craniocervical junction, as well as in the neck, mid-back, and low back. *Id.* He also had significant pain with palpation of his right hip and "actually winced[d] significantly." *Id.* Dr. Highsmith concluded that because the thoracic MRI showed no focal lesion or other pathology of the thoracic spine, Plaintiff was not a surgical candidate. Tr. at 332. He recommended Plaintiff follow up with a rheumatologist. *Id.*

Plaintiff returned to Dr. Castellone on August 12, 2010, and characterized his back pain as gnawing and severe. Tr. at 355. Plaintiff's memory and dizziness were noted to be better with medication. *Id.* Dr. Castellone noted that Plaintiff had "new" fibromyalgia and that his anxiety and hypertension were improving. Tr. at 356. He referred Plaintiff to a rheumatologist. *Id.*

State-agency consultant Lisa Varner completed a PRTF on August 25, 2010. Tr. at 266–79. She determined the record provided insufficient evidence upon which to make a medical disposition or to assess Plaintiff's functional limitations. *Id.* She noted that a

record from May 2009 showed a diagnosis of depression; however, examination showed normal orientation, affect, mood, memory, and insight and judgment. Tr. at 278.

On November 1, 2010, Plaintiff was seen by Gregory Niemer, M.D. ("Dr. Niemer"), at Low Country Rheumatology. Tr. at 341. He reported daily neck and back pain and stated the epidurals and TENS unit had not helped. *Id.* His diagnoses included fibromyalgia with multiple trigger points and degenerative disc disease of the lumbar and cervical spine. Tr. at 345, 347. Dr. Niemer recommended Plaintiff follow up with pain management for injections. Tr. at 345. Plaintiff followed up with Dr. Niemer on January 26, 2011. Tr. at 340. He reported having trouble getting to sleep and indicated his pain impacted his activities of daily living ("ADLs"). *Id.* Examination demonstrated 16 out of 18 tender points. *Id.* Dr. Niemer diagnosed fibromyalgia, degenerative disc disease, and insomnia. *Id.*

Plaintiff saw Dr. Castellone for an annual examination on February 4, 2011. Tr. at 352. Dr. Castellone noted that Plaintiff's degenerative disc disease and fibromyalgia were worsening and that his anxiety was stable. Tr. at 354. He recommended diet, exercise, and stress management. *Id.*

On February 10, 2011, Plaintiff saw Barton Sachs, M.D. ("Dr. Sachs"), of the Medical University of South Carolina's ("MUSC's") Orthopaedic Spine Surgery Center. Tr. at 386. Plaintiff described total body pain and discomfort and numbness throughout all four extremities. *Id.* He reported that he had stopped driving a truck over a year earlier because of dizzy spells and passing out. *Id.* On examination, Plaintiff was in no apparent distress and appeared to have full ROM in all four extremities. Tr. at 386–87. Dr. Sachs

noted that Plaintiff's x-rays showed some advanced degenerative disc disease at C6–7 with some spurring, but did not indicate any gross encroachment of the spinal canal. Tr. at 387. Plaintiff had no significant areas of tenderness at C7 and no gross instability on flexion or extension. *Id.* The radiologist interpreted the x-rays to show no alignment abnormalities and mild degenerative disc disease. Tr. at 392. Dr. Sachs noted that Plaintiff moved well. Tr. at 387. His impression was that Plaintiff's primary condition was one of diffuse pain associated with dizziness and blackout spells; that the condition was primarily neurological, as opposed to spinal; and that Plaintiff did not require surgical intervention. *Id.* He recommended Plaintiff follow up with a neurologist. *Id.*

### c.    Lay Witness Statements

Plaintiff submitted lay witness statements from his wife, his cousin, a friend, and a former supervisor.

Plaintiff's wife, Jane Keefer, reported that she struggled with balancing her work as a licensed practical nurse with taking care of her husband. Tr. at 184. She stated that Plaintiff had kept her up several times during the night because of his inability to get relief from pain. *Id.* She reported Plaintiff could not assist with household chores, maintain the cars, or perform household repairs. *Id.* She stated Plaintiff's medication resulted in memory loss; that he was depressed and moody due to pain; and that he could no longer play with his grandchildren or sit long enough to watch television. *Id.*

Plaintiff's cousin, Donna Sykes, stated that she moved into Plaintiff's home to help him with ADLs. Tr. at 174. She stated that even walking to the mailbox could be difficult for him on some days and that he had to lie down after taking a short walk. *Id.*

12

She noted that she cooked and shopped for Plaintiff and took him to his doctor's appointments. *Id.*

Plaintiff's friend, Shawn Sandella, reported that he sometimes helped Plaintiff with his yard work, especially if it involved any lifting. Tr. at 177. He noted having seen Plaintiff in pain from trying to pick up pine cones in his yard. *Id.*

Plaintiff's former boss, Dennis Hair, reported that Plaintiff had many absences for depression and back problems during the last 10 years that Plaintiff worked for him. Tr. at 393. He stated that Plaintiff ultimately had so many absences that he had to leave his job. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    March 10, 2011

At the hearing on March 10, 2011, Plaintiff stated that he lived with his wife, who was employed. *Id.* He testified that a cousin moved in with them three months earlier to help care for him. Tr. at 35.

He testified that he last worked as a self-employed truck driver on August 10, 2009. Tr. at 30. He stated he was an independent driver for approximately one year and, prior to that, worked as a company driver. Tr. at 31. He testified that he was also previously employed as a boiler operator, but left that job because of back, neck, and leg problems and depression. Tr. at 32 and 34. He stated that in the months before his alleged onset date, he turned down jobs because his back pain rendered him unable to drive. Tr.

13

at 37. He testified that his wife went on the road with him for the last six weeks that he worked to take care of him. *Id.* He said she would tell him to pull over if it looked like he was starting to get dizzy or was in substantial pain. *Id.* He stated that on his last driving trip, he abandoned the load half way because he could not finish the trip. Tr. at 38. Plaintiff testified that sitting in his truck became extremely painful during his last few months of work and that he could only push himself to do so for 30 minutes before having to stop. Tr. at 40.

Plaintiff testified that injections for his neck and back pain provided relief "to a degree." Tr. at 39. He stated they made the pain bearable, but did not allow him to walk for more than 15 or 20 minutes. Tr. at 39–40. He stated that he was told that he had so much scar tissue that he was not a candidate for surgery. Tr. at 41.

Plaintiff testified he spent most of his time lying around the house. Tr. at 32. He stated that he tried to walk some because his doctor told him it would help alleviate his arthritis symptoms. *Id.* He indicated he would walk around his house, yard, or "down the street a little ways," but stated that he always had to lie down to get pain relief after walking. Tr. at 32–33. He stated that his walks lasted 10 to 15 minutes. Tr. at 36. He estimated he spent up to half his day lying on the floor. Tr. at 36. Plaintiff explained that he would lie on the floor rather than on a couch or sofa because he experienced dizzy spells and was afraid he would fall. Tr. at 37. He stated that he could sit in a regular chair for about 10 minutes. Tr. at 47. He indicated he could force himself to sit longer, as he stated he was doing during the hearing, but that he would "pay for it" when he returned home and would have to take muscle relaxers and lie down. *Id.*

14

Plaintiff denied shopping for groceries or engaging in other activities outside of his home. Tr. at 33. He stated he was unable to perform household chores, such as cooking, cleaning, vacuuming, and doing laundry. Tr. at 44. He stated had gone to church "all the time" in the past, but no longer attended because he could not sit through the service. Tr. at 33. He denied having left the house by himself since he last worked as a truck driver because he was scared of passing out from pain. Tr. at 44.

He stated he took all of his medications as recommended and indicated they helped alleviate some of his pain, but also caused side effects. Tr. at 42. He endorsed side effects that included memory loss, insomnia, constipation, and dizziness. *Id.* He indicated his prescription for Lortab prevented him from driving and was illegal to take while driving commercially. Tr. at 42–43. Plaintiff stated that if he did not take his mediations, he would pass out. Tr. at 43. He testified he took medication for depression and had experienced symptoms of depression since his time as a boiler operator. *Id.* He testified all of the problems he described during the hearing were consistent with his condition as of his alleged onset date in 2009. Tr. at 47.

Plaintiff sought permission to stand-up during the hearing. Tr. at 43. Although Plaintiff's attorney stated that Plaintiff's wife was available to testify, he subsequently stated that the testimony would basically be corroborative of Plaintiff's testimony and agreed to submit her statement instead. Tr. at 45–46.

ii.     September 26, 2013

Plaintiff testified that he underwent two surgical procedures since the first hearing. Tr. at 410. He stated he was experiencing fainting spells prior to surgery, and that the

15

doctors in the ER informed him that he needed neck surgery. *Id.* He indicated he had two vertebrae removed from his neck and three vertebrae fused in January 2013. *Id.* He testified he also underwent a surgical procedure to his thoracic spine on July 15, 2013, to remove two discs, fuse three discs, and insert a titanium rod in his spine. *Id.* He stated he needed additional surgical intervention. *Id.*

Plaintiff testified he had received intermittent treatment for his back problems because he had lost insurance coverage when both he and his wife were unemployed. Tr. at 411. He stated his back problems had not improved and had continually worsened. *Id.* Plaintiff testified that he took medication for depression and anxiety. *Id.* He indicated his pain, depression, and anxiety were overwhelming at times. Tr. at 412. He stated he was also prescribed medication to treat fibromyalgia. *Id.*

### iii.    August 24, 2015

Plaintiff testified he stopped working as a truck driver because he was losing consciousness. Tr. at 587–88. He indicated problems with his spine caused him to pass out. Tr. at 588. He stated he complained to Dr. Castellone of constant pain that varied in intensity. *Id.*

Plaintiff estimated he could sit for 15 minutes at a time in 2009. Tr. at 590. He testified he experienced weakness in his bilateral arms and legs and had difficulty using his left hand. Tr. at 590–91. He indicated he was able to shower, dress, and engage in personal care tasks, but experienced pain and instability while performing those tasks. Tr. 592. He stated he performed some household chores, but had difficulty with any tasks

that required bending. Tr. at 593. He indicated he often alternated between the floor, the bed, and a chair and generally shifted positions every 10 to 15 minutes. *Id.*

### b.    Vocational Expert Testimony

### i.    March 10, 2011

Vocational Expert ("VE") J. Adger Brown, Jr., reviewed the record and testified at the hearing on March 10, 2011. Tr. at 48. The VE categorized Plaintiff's PRW as a boiler operator as medium, skilled work and as a tractor trailer driver as medium, semi-skilled work. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, but had to avoid dangerous machinery, work hazards, and driving. Tr. at 49. The VE testified that the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there was any other work that could accommodate those limitations. *Id.* The VE identified the jobs of quality control examiner, product sampler and weigher, and parts packer. Tr. at 49–50. The VE stated that these jobs would afford a sit/stand option so long as the hypothetical individual did not change position more frequently than every 30 to 45 minutes. Tr. at 50. Upon questioning by Plaintiff's counsel, the VE stated that the inability to focus and maintain concentration at least 20 percent of the time would preclude work. Tr. at 51–52.

### ii.    August 24, 2015

VE Dawn Bergren, BA, MSW, reviewed the record and testified at the hearing on August 24, 2015. Tr. at 594–95. The VE categorized Plaintiff's PRW as a tractor trailer truck driver, *Dictionary of Occupational Titles* ("*DOT*") number 904.383-010, as medium in exertional level with a specific vocational preparation ("SVP") of four. Tr. at

17

594. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work, but was limited to frequent climbing of ramps and stairs, stooping, kneeling, crouching, and crawling, as well as no exposure to work hazards, such as unprotected heights or dangerous machinery. *Id.* The VE indicated the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 594–95. The ALJ asked if there were other jobs the hypothetical individual could perform. Tr. at 595. The VE identified light jobs with an SVP of two as a cashier II, *DOT* number 211.462-010, with 22,000 positions in South Carolina and 1,188,000 positions in the national economy; a fast food worker, *DOT* number 311.472-010, with 34,000 positions in South Carolina and 1,599,000 positions in the national economy; and an inspector/hand packager, *DOT* number 559.687-074, with 6,000 positions in South Carolina and 335,000 positions in the national economy. *Id.* The ALJ asked if Plaintiff's PRW would provide any transferable skills to the sedentary exertional level. *Id.* The VE stated it would not. *Id.* She confirmed that her testimony was consistent with the *DOT*. *Id.* Plaintiff's attorney declined to question the VE. *Id.*

2.    The ALJ's Findings

In his decision dated September 23, 2015, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on September 30, 2009.
2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 10, 2009 through his date last insured of September 30, 2009 (20 CFR 404.1571 *et seq.*).
3.    Through the date last insured, the claimant had the following severe impairment: degenerative disc disease (20 CFR 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairment that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with: frequent climbing ramps/stairs, stooping, kneeling, crouching and crawling and no exposure to work hazards.

6.   Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on September 23, 1956 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from August 10, 2009, the alleged onset date, through September 30, 2009, the date last insured (20 CFR 404.1520(g)).

Tr. at 575–81.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the ALJ did not adequately evaluate Plaintiff's credibility; and

2)   the ALJ's decision was not supported by substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*,

---

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

21

658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

     2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Credibility

Plaintiff argues the ALJ based his credibility finding on the objective evidence alone and did not properly consider his statements or his ADLs. [ECF No. 13 at 17]. He maintains the ALJ should have considered whether his impairments were consistent with the performance of sedentary work instead of whether they precluded all work. *Id.* at 17–18.

The Commissioner argues the ALJ found Plaintiff's statements were inconsistent with the record as a whole. [ECF No. 15 at 11]. She maintains the ALJ explained that Plaintiff's physical examinations during the period closest to the DLI were generally benign and were inconsistent with his extreme subjective complaints. *Id.*

After finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce his alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the limitations they impose on his ability to do basic work activities. SSR 96-7p.[5]  If the claimant's statements about the intensity, persistence, or limiting effects of his symptoms

---

[5] The Social Security Administration recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p, eliminates use of the term "credibility," and clarifies that subjective symptom evaluation is not an examination of an individual's character. Because the ALJ decided this case prior to March 16, 2016, the effective date of SSR 16-3p, the court analyzes the ALJ's decision based on the provisions of SSR 96-7p, which required assessment of the claimant's credibility. Although SSR 16-3p eliminates the assessment of credibility, it requires assessment of most of the same factors to be considered under SSR 96-7p.

are not substantiated by the objective medical evidence, the ALJ is required to consider the claimant's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, the ALJ should also consider the claimant's ADLs; the location, duration, frequency, and intensity of his pain or other symptoms; factors that precipitate and aggravate his symptoms; the type, dosage, effectiveness, and side effects of his medications; treatment, other than medication, the claimant receives or has received; any measures other than treatment and medications the claimant uses or has used to relieve his pain or other symptoms; and any other relevant factors concerning the claimant's limitations and restrictions. *Id.*

The ALJ must cite specific reasons to support his finding on credibility, and his reasons must be consistent with the evidence in the case record. *Id.* His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* In *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations from pain to the other evidence of record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit. The court subsequently stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v.*

*Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects" of his symptoms were "not entirely credible." Tr. at 577. He stated the objective evidence did not "come near indicating the presence of an impairment which would cause the rather extreme limitations alleged by the claimant." Tr. at 577–78. He noted that the record contained no explanation as to how Plaintiff's back pain caused blackouts and disruption in circulation. Tr. at 578. He indicated the tests after Plaintiff's DLI showed mild degenerative changes. *Id.* He noted that the diagnosis of fibromyalgia was made "well after" the DLI. *Id.* He stated Dr. Castellone's examinations were "generally benign" and were "certainly not consistent with the extreme subjective complaints" and that mental health observations reflected "no abnormal findings." *Id.* He considered that Plaintiff did not seek additional treatment for pain, including physical therapy, biofeedback, surgery, use of a TENS unit, or treatment from a pain clinic during the relevant period. *Id.* He observed Plaintiff's symptoms improved with a series of epidural steroid injections administered after Plaintiff's DLI. *Id.* The ALJ noted that Plaintiff had received no specialized mental health treatment; had reported that symptoms of depression and anxiety were improving with medication; and had complained of no side effects from his medications. *Id.* He indicated Plaintiff's physicians' reports failed to "reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were disabled during the relevant period" and discussed the objective findings for the period following Plaintiff's DLI. Tr. at 578–79. He considered the

25

opinions of the lay witnesses, but gave them "minimal weight" because they were inconsistent with Plaintiff's presentation upon routine examination and his ability to engage in ADLs. Tr. at 579. In addressing Mr. Hair's statement, the ALJ noted that the fact that Plaintiff continued to work in other positions until August 2009 detracted from the credibility of Mr. Hair's assessment of Plaintiff's symptoms and limitations. *Id.* He concluded "[o]verall, this conservative course of treatment, considered with the lack of objective evidence explaining the claimant's subjective complaints, is inconsistent with a level of severity that would preclude the claimant from sustaining any work activity during the relevant period." *Id.*

The court's review of the ALJ's decision reveals that he failed to consider several factors that were pertinent to an assessment of Plaintiff's credibility. Although the ALJ cited multiple objective test results that he found to be inconsistent with Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms, SSR 96-7p requires the ALJ to consider more than the diagnostic findings.

As an initial matter, the ALJ failed to consider Dr. Hoover's November 24, 2009 observation that Plaintiff had decreased bilateral sensation and demonstrated pain with transitional movements. Tr. at 365. Dr. Hoover indicated Plaintiff had "a lot of cramping" and she interpreted the NCS to show nerve-root irritation at S1. *Id.* The ALJ cited a normal exam during the same period, but he failed to reconcile it with the abnormalities noted by Dr. Hoover. *See* Tr. at 578.

The ALJ also failed to consider Plaintiff's statements to his physicians regarding the limiting effects of his symptoms. Dr. Hoover's November 24, 2009 treatment note

indicates Plaintiff reported he was unable to "lift anything," had weakness in his legs, and experienced numbness and tingling that migrated from his legs to his feet. Tr. at 365. On December 3, 2009, Plaintiff reported to Dr. Phillips that his pain was exacerbated by bending, lifting, or standing for longer than three to five minutes. Tr. at 225. On December 23, 2009, Plaintiff reported to Dr. Phillips that the epidural injection decreased his pain for two weeks, but that he still experienced weakness. Tr. at 229. On January 6, 2010, Plaintiff reported his pain was aggravated by "carrying things, bending, and sometimes walking." Tr. at 233.

In April 2010 and on several other occasions, Plaintiff reported that his dizziness and syncope caused him to stop working. Tr. at 37, 44, 313, 386, and 587–88. During the hearing, Plaintiff testified the syncope was caused by his spinal problems (Tr. at 588), but the ALJ dismissed Plaintiff's allegation and concluded the record pointed to no medically-determinable impairment as a source of syncope. Tr. at 578. However, the undersigned notes that Dr. Sachs suggested Plaintiff's syncope had a neurological source (Tr. at 387), and Plaintiff previously testified that he was experiencing syncopal episodes immediately prior to undergoing neck surgery. Tr. at 410. Thus, it appears the ALJ did not consider the whole record in concluding Plaintiff had no medically-determinable impairment likely to cause syncope.[6]

While the ALJ indicated Plaintiff's statements were refuted by his ADLs, he only cited Plaintiff's abilities to bathe, dress, and assist his wife with household chores. Tr. at

---

[6] It may be necessary to obtain Plaintiff's testimony as to the frequency of and factors that contributed to his syncopal episodes. It may also be beneficial to obtain a medical opinion as to whether Plaintiff's complaints of dizziness and syncope could be explained by the objective medical evidence obtained in the months following his DLI.

577. He did not explain how these activities were inconsistent with Plaintiff's complaints and ignored his testimony that he experienced pain and instability while engaging in personal care and was unable to bend while performing household chores. *Compare* Tr. at 592–93, with Tr. at 579. A review of the record reveals that Plaintiff reported limited ADLs in the months following his DLI. *See* Tr. at 225 (reporting he was unable to work as a truck driver or to perform general house maintenance without pain on December 3, 2009) and 233 (stating his daily activity consistent of "just resting and taking it easy due to the pain" on January 6, 2010).

Finally, the ALJ's decision to discredit Mr. Hair's statement based on Plaintiff's subsequent work ignores the fact that Plaintiff's earnings were significantly reduced and sometimes nonexistent in the years after his termination from Westvaco.[7] While Plaintiff's reduced earnings could be explained by something other than the frequent health-related absences referenced in Mr. Hair's letter (Tr. at 393), the hearing transcript reflects no questions regarding the reasons for Plaintiff's reduced earnings. Therefore, it appears the ALJ ignored a possible correlation between Plaintiff's health problems and his reduced earnings in evaluating Mr. Hair's statement.

The ALJ concluded the evidence was inconsistent with a finding that Plaintiff was precluded from performing all work during the relevant period, but a finding of disability would have been directed under the Social Security Act if Plaintiff were limited to

---

[7] Plaintiff testified Mr. Hair was his supervisor at Westvaco. Tr. at 596. His earnings record shows he last worked for Westvaco in 1998. Tr. at 698. A summary of his earnings show that he reported earnings of $42,723.29 in 1997, $20,631.47 in 1998, $17,367.80 in 1999, $18,677.23 in 2000, $3,977.84 in 2001, $6,114.49 in 2002, $0 in 2003, $0 in 2004, $1,436.55 in 2005, $0 in 2006, $9,251.00 in 2007, and $2,281.75 in 2008. Tr. at 696.

sedentary work. *See* 20 CFR Part 404, Subpart P, App'x 2, § 201.10 (directing a finding of "disabled" for claimants with a maximum sustained work capability limited to sedentary work that meet the following criteria: closely approaching advanced age; limited or less education; and history of skilled or semiskilled work, without transferable skills). Because the ALJ's assessment of Plaintiff's credibility ignores evidence that arguably suggested he was limited to sedentary work, it is not supported by substantial evidence.

### 2.    Substantial Evidence

Plaintiff argues the ALJ did not adequately evaluate the evidence after his DLI, and only noted that the records were "less relevant to the claimant's claim for disability the more chronologically distant they are" from the DLI. [ECF No. 13 at 13]. He maintains the ALJ limited his review of the evidence to that for the period prior to the DLI. *Id.* He contends the ALJ erred in adopting the prior ALJ's flawed discussion of the evidence prior to the DLI. *Id.* at 16.

The Commissioner argues the ALJ considered the evidence immediately following Plaintiff's DLI and found it to be unremarkable. [ECF No. 15 at 9]. She maintains that medical records for the period after Plaintiff's DLI showed him to have no functional limitations as a result of pain. *Id.* at 10.

"Medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird*, 699 F.3d at 340, *citing Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987). "[P]ost-DLI medical evidence generally is admissible in an SSA

disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition." *Id.*, *citing Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969). Furthermore, "retrospective consideration of medical evidence is especially appropriate when corroborated by lay evidence." *Id.* at 342, *citing Moore*, 418 F.2d at 1226. In *Bird*, the court explained that under its decisions in *Moore* and *Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005), "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Id.* at 341, *citing Moore*, 418 F.2d at 1226.

"In evaluating whether or not the ALJ's ultimate conclusion is supported by substantial evidence, this court can do no more than require that the ALJ carefully consider the evidence, make reasonable and supportable choices and explain his conclusions." *McCall v. Apfel*, 27 F. Supp. 2d 723, 731 (S.D.W.Va. 1999). "[T]he Commissioner, not the court, is charged with resolving conflicts in the evidence." *Belcher v. Apfel*, 56 F. Supp. 2d 662, 665 (S.D.W.Va. 1999). However, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.*, citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

The ALJ found degenerative disc disease to be Plaintiff's only severe impairment. Tr. at 575. He indicated the evidence summaries "contained in the vacated decisions" were "in all respects full and fair statements of the underlying records" and adopted the testimony and exhibits "by reference." Tr. at 577. He noted he had considered Plaintiff's

medical records following his DLI, but found the records became less relevant to his claim "the more chronologically distant" they were from his DLI. *Id.* He then proceeded to document what he considered to be benign objective findings in the seven-month period following Plaintiff's DLI. Tr. at 579.

A review of the ALJ's decision reveals that he did not ignore the medical evidence following Plaintiff's DLI, but rather concluded that the objective evidence did not support a finding of disability through April 2010. *See* Tr. at 578–79. However, as discussed earlier, the ALJ ignored important evidence in reaching this conclusion. His decision does not reflect consideration of the entire record or a weighing of some conflicting evidence. Therefore, the ALJ's decision is not supported by substantial evidence.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.

In light of this case's lengthy procedural history, the court has considered whether it would be most appropriate to reverse and remand it for an award of benefits. "The Fourth Circuit has explained that outright reversal—without remand for further consideration—is appropriate under sentence four 'where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose'" and

"where a claimant has presented clear and convincing evidence that he is entitled to benefits." *Goodwine v. Colvin*, No. 3:12-2107-DCN, 2014 WL 692913, at *8 (D.S.C. Feb. 21, 2014), *citing Breeden v. Weinberger*, 493 F.3d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sulllivan*, 973 f.3d 326, 333 (4th Cir. 1992). This case fails to meet the criteria for a remand for benefits because Plaintiff has not presented "clear and convincing evidence that he is entitled to benefits." *See id.* The court's finding of error is based on the ALJ's failure to consider and weigh all the evidence. Furthermore, additional testimony regarding Plaintiff's syncopal episodes and work activity after 1998 is needed for the ALJ to adequately assess Plaintiff's statements and the other statements of record. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

September 30, 2016                          Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge